STATE . v. ROBERT MANFORD.[1]

January 26, 1906.

Nos. 14,454—(19).

**Act. Constitutional.**

On the authority of State v. Corbett, 57 Minn. 345, 59 N. W. 317, 24 L. R. A. 498, it is *held* that chapter 66, p. 182, of the Laws of 1893, entitled "An act to regulate the sale and redemption of transportation tickets of common carriers, and to provide punishment for the violation of the same," is constitutional.

Appeal by defendant from a judgment of the district court for Hennepin county, Simpson, J., whereby he was convicted of the offense set forth in the opinion and sentenced to pay a fine of $100 or, in default of payment thereof, to imprisonment for thirty days in the county jail. Affirmed.

*John W. Arctander,* for appellant.

*Edward T. Young,* Attorney General, *Al. J. Smith,* County Attorney, *Rome G. Brown, Charles S. Albert,* and *Frederick R. Babcock,* for the state.

ELLIOTT, J.

In the court below the defendant was convicted of selling a railroad ticket without a license as required by chapter 66, p. 182, Laws 1893. The appeal is from a judgment of conviction entered after the denial of a motion for a new trial.

1Reported in 106 N. W. 907.

There is no controversy as to the facts. The defendant sold the ticket in violation of the statute, and the conviction is proper and must stand unless the act is unconstitutional. The briefs of counsel cover a wide range and are very able and exhaustive; but, in view of the previous decision of this court, we find it unnecessary to consider the general questions involved.

The constitutionality of chapter 66, p. 182, Laws 1893, was settled by State v. Corbett, 57 Minn. 345, 59 N. W. 317, 24 L. R. A. 498; and, while a vigorous attack has been made upon the authority of this case, we find no sufficient reasons for overruling it. The act was approved April 19, 1893, and State v. Corbett was decided May 25, 1894, after full argument and careful consideration. The decision bears internal evidence of the most careful consideration. The learned justice who spoke for the court said: "We have endeavored to give this case the consideration which its importance deserves, and are not able to see that any of the objections urged against the validity of the act are well founded. With the policy or wisdom of it we have nothing to do." The decision has stood unchallenged for a number of years, and is recognized as a leading case upon the question in the country. The fact that one of the cases therein cited has been discredited in no way affects the value of the decision. State v. Corbett rests upon its own reasoning, and but slightly, if at all, upon authority. Practically all the questions argued on this appeal were presented on the former hearing. The record does not justify the defendant's claim that the Corbett case was collusive. The briefs in that case were not so elaborate as those presented to us, but all the objections to the legislation appear to have been noted and presented with reasonable care and ability. It would not do to infer collusion from the mere inadequacy of the briefs. The other matters from which the defendant asks us to infer collusion are dehors the record and cannot be considered. The constitutionality of the act has thus been determined after full argument and careful consideration. It is elementary that, when a rule has been deliberately adopted and declared, it ought not to be disturbed by the same court, except for very cogent reasons, and upon a clear manifestation of error. State v. District Court of Mower County, 78 Minn. 464, 466, 81 N. W. 323. If the practice were otherwise, it would leave us in a very perplexing state of uncertainty as to the law.

It would seem unnecessary at this late date in the history of the law to discuss the general rule of stare decisis, but, in view of the vigorous attack which the defendant makes upon the doctrine of precedent, a few comments may not be inappropriate.   The reader who is interested in the application and development of the doctrine of precedent will find interesting and able discussions in chapter 6 of Sir Frederick Pollock's First Book of Jurisprudence, and in articles in 6 Harvard Law Review, 26, and in the Proceedings of the American Bar Association for 1902, p. 373.   See also Hanford v. Artcher, 4 Hill (N. Y.) 270, 321; Sharswood, Law Lectures, lecture 2; Ram, Legal Judgment, appendix 4; Dicey, Law and Opinion in England, lecture 11, and appendix, p. 481.   For the satirist's view, see 11 Swift's Works (Scott's 2d Ed.) p. 318.

The civil and the common law divide the legal dominion of the civilized world.   That which most distinguishes the one from the other is the weight and importance attached to recorded decisions.   In the former precedent has played a relatively unimportant part, while in the latter it has been in a large measure the controlling principle.   The distinction is fundamental.   In the civil law each case is, in theory, determined by the judge in accordance with his conception of the natural and moral rights involved.   This system has never taken root among the English-speaking people, although from the time when the English judges were first in a measure brought under its influence they have adopted many of its liberal, just, and beneficent principles.   But English and American courts have always been sceptical of the value of any theory of natural justice as a working principle in the administration of the law.   It substitutes the individual for a system.   Men view it from the different angles of their varying personalities.   To use a classic illustration, the reason of Titus frequently differs from the reason of Septimus.   The great writers on the civil law recognize this. Savigny says: "When a case is submitted for the decision of one unskilled in law, he will generally decide it according to a confused impression of the whole, and, nevertheless, if of sound sense and decided character, will believe himself very sure of his point.   It will, however, be very much a matter of chance whether a second person of like qualities will give the same or the opposite opinion."   A system of law rest-

ing upon such principles is necessarily unstable and unsuited to the genius of the English-speaking race, which has always been willing to a degree to sacrifice abstract justice to certainty and practicability. As noted by Sir Henry Maine, one of the rarest qualities of national character is the capacity for applying and working out the law as such at the cost of constant miscarriages of abstract justice, without at the same time losing the hope or the wish that law may be conformed to a higher ideal. After referring to the development and the decay of ancient systems, he says: "No durable system of jurisprudence could be produced in this way. A community which never hesitated to relax rules of written law whenever they stood in the way of an ideally perfect decision on the facts of particular cases would only, if it bequeathed any body of judicial principles to posterity, bequeath one consisting of the ideas of right and wrong which happened to be prevalent at the time. Such jurisprudence would contain no framework to which the more advanced conceptions of subsequent ages could be fitted. It would amount at the best to a philosophy marked with the imperfections of the civilization under which it grew up." Maine, Ancient Law, 73.

The early English chancellors based their decisions on their peculiar notions of the law of God, and looked to Heaven, instead of the sheriff, for the execution of their decrees. Denunciation often became a part of the decree. The virtue of respect and consideration for the opinions of learned men who had gone before was conspicuously absent. The vigorous manner in which the learned counsel for the appellant excoriates those who disagree with his views of the law suggests a case in the Year Book (4 Hen. VII, 4b) where Morton, one of the early ecclesiastical chancellors, announced very good law, so far as it went, in the following emphatic language: "It is very well that every case should be consistent with the law of God, and that law forbids that any executor should indulge in any disposition he may have to waste the goods of the testator; and if he does, and does not make amends if he be able, he shall be damned in hell."

But our law has been constructed on a different theory. Every presumption is in favor of the correctness of a decision of an appellate court. Consistency and certainty require the courts to ad-

here to the rule of stare decisis. Mirehouse v. Rennel, 1 Cl. & F. 527, Parke, J. As said by Lord Tenterden in Selby v. Barden, 3 B. & Ald. 2, 17: "The decisions of our predecessors, the judges of former times, ought to be followed and adopted unless we can see very clearly that they are erroneous, for otherwise there will be no certainty in the administration of the law." This is a fair statement of the rule as it is applied in the United States and in the English courts other than the House of Lords, which now holds that it has no power to reverse its own decisions, even when they are palpably and manifestly founded on error. Houldsworth v. City of Glasgow Bank (1880) 5 App. Cas. 317, 335, Lord Blackburn; Darley v. Mitchell (1886) 11 App. Cas. 127, 137, Lord Halsbury.

While not yielding blind obedience to the past, we recognize the obligation to respect the former decisions of the court, and to adhere to them, unless they are clearly and manifestly erroneous or no longer adapted to changed conditions of society. We find no such reasons for overruling State v. Corbett, and the judgment appealed from is therefore affirmed.

Judgment affirmed.

On March 6, 1906, the following opinion was filed:

PER CURIAM.

The defendant, by his assignments of error, brief, and oral argument, urged the claim, with others, that the statute in question in this case was void because it is in direct violation of the fourteenth amendment to the constitution of the United States:

> Nor shall any state deprive any person of life, liberty or property without due process of law

—in that it deprives the defendant of his property, business, and livelihood; and, further, that it is in direct violation of section 8, art. 1, of the constitution of the United States:

> The congress shall have power * * * to regulate commerce with foreign nations and among the several states and with the Indian tribes.

97 M.—12

The defendant, in his petition for a reargument of the cause, urges that the court in its original opinion herein did not decide the questions so raised and argued. This claim is based upon a misapprehension of the scope of the opinion. The questions were necessarily involved in the decision of the court, and were considered and determined adversely to the defendant. We did not discuss the questions in the opinion because it was deemed to be unnecessary, in view of the fact that the statute has been held constitutional in the case of State v. Corbett, 57 Minn. 345, 59 N. W. 317, 24 L. R. A. 498. We, however, did and do hold that the statute violates neither the constitution of this state nor that of the United States.

It is therefore ordered that the petition for reargument be, and it is hereby, denied, and, further, that this opinion be, and is hereby, made a part of the original opinion herein.